694 F.Supp. 1443 (1988)
In re AIR PASSENGER COMPUTER RESERVATIONS SYSTEMS ANTITRUST LITIGATION.
CONTINENTAL AIR LINES, INC., and Texas International Airlines, Inc., Plaintiffs,
v.
AMERICAN AIRLINES, INC., and United Air Lines, Inc., Defendants.
NEW YORK AIRLINES, INC., Plaintiff,
v.
AMERICAN AIRLINES, INC., and United Air Lines, Inc., Defendants.
USAIR, INC., Pacific Southwest Airlines, Inc., Aircal, Inc., Ozark Air Lines, Inc., Muse Air Corporation, Alaska Airlines, Inc., Midway Airlines, Inc., Northwest Airlines, Inc., and Western Air Lines, Inc., Plaintiffs,
v.
AMERICAN AIRLINES, INC., and United Air Lines, Inc., Defendants.
AMERICAN AIRLINES, INC., Counterclaimant,
v.
USAIR, INC., Pacific Southwest Airlines, Inc., Aircal, Inc., Ozark Air Lines, Inc., Muse Air Corporation, Alaska Airlines, Inc., Midway Airlines, Inc., Northwest Airlines, Inc., and Western Air Lines, Inc., Counterdefendants.
PACIFIC EXPRESS, INC., and Pacific Express Holding Co., Plaintiffs,
v.
UNITED AIR LINES, INC., Defendant.
MDL No. 667-ER. Civ. Nos. 86-0696-ER(Mcx), 86-0697-ER(Mcx), 84-5185-ER(Mcx) and 84-8918-ER(Tx).
United States District Court, C.D. California.
August 25, 1988.
*1444 *1445 *1446 *1447 *1448 *1449 Robert E. Cooper, J. Edd Stepp, Jr., Steven C. McCracken, Gibson, Dunn & Crutcher, Los Angeles, Cal., for American Airlines, Inc.
Roberts B. Owen, Covington & Burling, Washington, D.C., Ralph Zarefsky, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., Stephen G. Sawyer, United Air Lines, Inc., Elk Grove Village, Ill., for United Air Lines, Inc.
David Boies, Cravath, Swaine & Moore, New York City, William T. Bisset, Hughes, Hubbard & Reed, Los Angeles, Cal., William F. Duker, Duker & Barrett, New York City, for Continental plaintiffs in Civ. Nos. 86-0696-ER(Mcx) and 86-0697-ER(Mcx).
Maxwell M. Blecher, Norman Pine, Beverly S. Tillett, Blecher & Collins, P.C., Los Angeles, Cal., for USAir plaintiffs in Civ. No. 84-8918-ER(Tx).
Maxwell M. Blecher, Norman Pine, Beverly S. Tillett, Blecher & Collins, P.C., Los Angeles, Cal., for Pacific Exp. plaintiffs in Civ. No. 84-5185-ER(Mcx).
AMENDED MEMORANDUM DECISION AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ON SECTION TWO SHERMAN ACT CLAIMS
RAFEEDIE, District Judge.
The captioned case came on for hearing before this Court, the Honorable Edward Rafeedie, United States District Judge, presiding, on August 8, 1988. The following motions were heard; Defendant United Airlines ("United") and American Airlines' ("American") Motions for Summary Judgment on plaintiffs' claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, Plaintiff Continental's Motions for Partial Summary Judgment: (1) that Defendants' Computerized Reservations Systems are Essential Facilities, (2) that Defendants did not allow Equal Access to their Essential Facilities, and (3) that Defendants have Monopoly Power.
The Court, having read and considered the papers submitted, and the argument of counsel at the hearing, orders that summary judgment should be granted in part, and denied in part, for the reasons stated in this Memorandum Decision and Order.

FACTUAL BACKGROUND
This case arises out of defendants' ownership of Computerized Reservation Systems ("CRS"). A CRS is composed of computer terminals and printers in travel agents' offices which are telephonically linked to the vendor's computer. This equipment enables the travel agent to send and receive air transportation booking information, book flights and print out a ticket. These CRSs are owned by various airlines and each system contains flight information for airlines other than the vendor airline. The vendor charges the travel agent for the use of its system and they charge other airlines fees for booking air transportation through the CRS.
Defendant American owns the world's largest CRS, SABRE, which is comprised of six IBM mainframe computers that are connected to nearly 100,000 other devices, including computer terminals, ticket printers, and boarding pass printers. More than 11,000 travel agency locations use SABRE to handle airline as well as hotel and car reservations for their clients. SABRE contains schedules for more than 650 airlines and projects more than one year into the future. SABRE processes over 10 million reservations a month.
Defendant United was the first company to announce plans to market a CRS. United's CRS, Apollo, has been the second largest CRS in the world with an estimated market share of 23% of all travel agency locations. In 1981, Apollo claimed a 39% market share. SABRE's market share is in *1450 the 30% range, down from 40% in 1980. The market also includes SystemOne (or SODA), owned by Eastern Airlines, PARS is run by TWA, and DATAS II is owned by Delta.
Originally, travel agents paid a fee for CRS equipment rental and other services, while airlines were not charged for participating in the CRS or for bookings. The vendor airline, however, received substantial revenue from additional airline business they received through "biasing" the system. Biasing is the practice of displaying flight information in a way that favors the vendor airline. The travel agent inputs its client's preferences and the CRS displays, in order of desirability, the various flights. However, each system was biased, to differing degrees, so that the desirability of the vendor's flights would be artificially inflated.
In the late 1970's, SABRE and Apollo began signing carriers to "cohost contracts" under which the contracting carrier's product would receive preferential treatment in the CRS in return for a fee paid on each booking which the carrier received through the CRS. Beginning in 1981, vendor airlines began entering into individually negotiated contracts with each airline, and booking fees rose from $0.25 per booking up to $3.00 per booking.
In August 1984, the Civil Aeronautics Board ("CAB") established a number of rules governing the practices of CRS vendors. Those rules required each CRS vendor to make available an unbiased primary display, to charge all carriers participating in its CRS the same booking fees for the same level of service, and to make CRS marketing data available for sale. The CAB declined to regulate booking fees. 49 C.F.R. 255.
In response to the CAB rules, American announced it would charge $1.75 for booking, and United followed with a $1.85 booking fee. Competing CRS vendors are currently charging the following fees: the SystemOne fees are $1.75 and $2.00 for direct access, the PARS fees are $1.75 and $2.00 for direct access, and the DATAS II fees are $1.50 and $1.75 for direct access.

I. Standard for Summary Judgment
Rule 56 of the Federal Rules of Civil Procedure states that the court shall enter judgment if "the pleadings, depositions [and] affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The nonmoving party must show there is a genuine issue of fact if the specific facts set forth by the moving party, coupled with undisputed contextual or background facts, are such that a rational or reasonable jury might return a verdict in its favor based on the evidence. T.W. Electrical Service v. Pacific Electrical Contractors, 809 F.2d 626 (9th Cir.1987). The nonmoving party can meet this burden with any kind of evidence listed in Federal Rule 56(c), but the pleadings alone are not enough. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All that is required at this stage is that sufficient evidence supporting the claimed factual dispute be shown to require a factfinder to resolve the parties' disputing versions of the truth at trial. T.W. Electrical, 809 F.2d at 630. The judge is not to weigh conflicting evidence with respect to disputed material facts, nor should the judge make credibility determinations with respect to statements in the affidavits. At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party. Id.
The Supreme Court has plainly stated that the standard for summary judgment applies equally to antitrust cases as it does to any other case. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

II. Essential Facilities Doctrine[1]
The essential facilities doctrine imposes on a business that controls an essential *1451 facility the obligation to provide its competitors reasonable access to that facility. Byars v. Bluff City News Co., 609 F.2d 843, 856 (6th Cir.1979). An essential facility is one which cannot be reasonably duplicated and to which access is necessary if one wishes to compete. Fishman v. Estate of Wirtz, 807 F.2d 520, 539 (7th Cir.1986). A refusal to deal in this context violates section 2 because control of an essential facility can "extend monopoly power from one stage of production to another, and from one market into another." MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1132 (7th Cir.1983).
A facility or resource is "essential" when competitors must have access to the facility to meaningfully be able to compete with the firm controlling the facility. Holmes, 1987 Antitrust Law Handbook, section 2.06, at 175. The doctrine has been applied to electric transmission lines, football and basketball stadiums, downhill ski hills, natural gas pipelines, and local telephone facilities. To be essential, "a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants." Fishman, 807 F.2d at 539 (quoting, Hecht v. Pro-Football, Inc., 570 F.2d 982, 992 (D.C.Cir.1977), cert. denied, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978)). "The point of the essential facilities doctrine is that a potential market entrant should not be forced simultaneously to enter a second market, with its own large capital requirements." Fishman, 807 F.2d at 540. A participant in the down-stream market, who also controls a facility which is deemed essential to the down-stream market, has the power to increase the costs of market entry through its control of the essential facility. The facility owner has the power to monopolize the market to which his facility is the "bottleneck." Id.; Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 194 F.2d 484, 487 (1st Cir.), cert. denied, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952).
Plaintiff's contend that SABRE is an essential facility for domestic airlines; that is, SABRE confers exclusive access to a large number of travel agents, and all domestic airlines are dependent on SABRE because no airlines can afford to forgo access to the SABRE travel agents, therefore, rival CRSs are not substitutes for SABRE. It is argued that American, as the major CRS vendor, holds all other airlines captive by virtue of the essential need for access to the SABRE travel agents.
American contends that this is simply not an essential facilities case. In a normal case brought under this doctrine, the facility at issue constitutes a bottleneck to competition in the downstream market. Control of the bottleneck by a competitor can foreclose competition in the underlying market. For example, in United States v. Terminal R.R. Ass'n, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), the railroad combination's denial of the use of its terminal facilities to non-member railroads would have foreclosed "any other reasonable means of entering the city" to the non-members, making it impossible to gain access to St. Louis. In the MCI case, foreclosure of access to local telephone distribution channels precluded MCI from competing in the long distance telephone service market because access to the local distribution channels is necessary to providing long distance service. The court stated that, given present technology, local telephone service is generally regarded as a natural monopoly and is regulated as such. Therefore, it would not be economically feasible for MCI to duplicate AT & T's local distribution facilities. Such duplication would involve laying millions of miles of cable and line to individual homes and businesses, and regulatory authorization could not be obtained for such an uneconomical duplication. MCI, 708 F.2d at 1133. Similarly, in Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), a regulated electric utility refused to sell power wholesale, or to transmit power purchased from other sources to municipalities which had *1452 chosen to own their own retail distribution systems. The electric utility's facility for transmitting electric power was essential to competition in the downstream market for the retail distribution of electric power. Again, the facility was along the lines of a natural monopoly. That is, duplication of the facility would be an inefficient waste of resources where the one facility is all that is needed, absent anticompetitive conduct by the facility owner with respect to a downstream market. The antitrust laws will relieve a competitor of the need to build its own production facilities only where the market will not support more than one. Fishman, 807 F.2d at 574 (Easterbrook, dissenting). See, Consolidated Gas Co. of Fla. v. City Gas Co. of Fla., 665 F.Supp. 1493 (S.D.Fla.1987) (a gas pipeline was deemed essential based upon the increased costs of gas which would be caused by the uneconomical duplication of an existing pipeline).
In Fishman, the Seventh Circuit upheld the district court's finding that the Chicago Stadium was the only stadium in the Chicago Metropolitan area which was suitable for the exhibition of professional basketball, and that it could not feasibly be duplicated by plaintiffs. Since building a new stadium would cost $19 million, and the basketball franchise was substantially less expensive than a stadium, the court held that duplication of the facility would be unreasonable. On this basis, the court held that the Chicago Stadium was essential to competition in the market for the exhibition of professional basketball in Chicago. Fishman, 807 F.2d 539-40. See, Hecht v. Pro-Football, Inc., 570 F.2d 982 (D.C.Cir. 1977), cert. denied, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978) (football stadium in Washington D.C. deemed essential to market for professional football exhibition).
In this case, there are channels of distribution other than SABRE because there are computerized reservation systems in competition with SABRE. Thus, plaintiffs can look to other systems for alternative channels of distribution and are not forced to enter the market for CRSs in order to compete in the downstream market of airline transportation. Nevertheless, plaintiffs claim that SABRE is essential because the other CRSs are not effective substitutes for SABRE.
Under ideal market conditions, the absence of an airline from SABRE would decrease SABRE's attractiveness to travel agents and cause them to seek out better systems. Continental, however, points to a number of market imperfections which allegedly impair better CRSs from attracting SABRE agents.
American's contracts with SABRE travel agents contain provisions which plaintiffs argue make it very difficult for an agent to switch CRS systems. The contracts contain a SABRE usage clause ("parity of usage rule")[2], a liquidated damages provision and roll-over provisions. American's "minimum of parity" rule required new subscribers to have at least as many SABRE Computerized Reservation Terminals ("CRTs") as there are non-SABRE CRTs at each location.[3] American also regularly employ five year term contracts which contained a provision requiring a SABRE agent to sign a new five year contract whenever any new piece of equipment is installed or even replaced during the life of the existing contract. Finally, the liquidated damages provision in the contracts (installed after the anti-bias rules became effective) is (typically) as follows; 80% of the agent's contract fee plus 200 (the average monthly segment booking per SABRE CRT) multiplied by the $1.75 segment fee multiplied by the number of SABRE CRTs in place, multiplied by the remaining months of the contract.
Plaintiffs continue the attack by arguing that travel agents have strong economic incentives to carry only one CRS. First, the installation of a CRS, or additional CRSs, imposes significant costs on the agency in terms of both equipment and *1453 training. For example, the average SABRE and Apollo subscriber fees per year per agency location (not agency) in 1986 were $10,596 and $12,763, respectively. Thus, agents are unlikely to switch to another CRS unless the costs of conversion are paid for by the new vendor. Second, the minimum of parity rule constitutes a contractual restriction on the subscribing agents use of other CRSs.
Finally, plaintiffs point out that the airline industry has always been characterized by narrow operating margins, therefore, even slight reductions in sales have a disproportionately adverse impact on profits and the carrier's ability to compete.
These contractual provisions and the structure of the air transportation market are claimed to prevent effective competition in the CRS market, and consequently, justify plaintiffs' argument that SABRE is an essential facility to the air transportation market despite the existence of competing CRSs. Plaintiffs' point to the conclusions of government regulatory bodies and Judge Posner's opinion for the court in United Airlines, Inc. v. C.A.B., 766 F.2d 1107 (7th Cir.1985) where the court upheld the CAB's antibias rule. In United, the court wrote:
Unless an airline limits its operations to one small region, it must, whether or not it has its own computerized reservation system, persuade several of the largest airlines to list its flights in their [CRS] systems if it is to have a fair chance of success. It is thus dependent for an essential facility on what may be its principal competitors. Id. at 1114.
Judge Posner's opinion has a number of helpful observations. First, it is necessary to put the case in its proper perspective. The Seventh Circuit held, as a matter of administrative law, that the CAB's exercise of rulemaking authority was within the scope delegated by Congress through the Federal Trade Commission Act, section 5, as amended 15 U.S.C. § 45, and the Federal Aviation Act of 1958, section 411, 49 U.S.C. App. § 1381. Under these statutory provisions the CAB can forbid anticompetitive practices "before they become serious enough to violate the Sherman Act." United, 766 F.2d at 1114. The court ruled that the Board's ruling was "plausible, if not compelling, [and its] rules can not be set aside as arbitrary and capricious." Id. at 1116. Therefore, the Seventh Circuit did not rule that Apollo was an essential facility, it merely held that the Board's analysis was not arbitrary and capricious in light of its statutory authority. Thus, the Board has the power to outlaw conduct which may restrain competition.
More interesting, however, are Judge Posner's comments on the CRS market:
If the owner of a computerized reservation system used the system to weaken competition from other airlines, it is a little hard to see why those airlines would not simply switch their patronage to a competing system that was not biased against them. Competition would (one might have thought) force at least some of the owners of competing systems to offer unbiased listings in order to expand the market for their systems. Even if every airline owner refused, because of the impact on its air transportation revenues, to give equal prominence to a competitor's flights, there is nothing to stop independent companies from offering a computerized reservation system with no such inhibitionsand one does.
The court, however, goes on to state that an airline needs to be listed "at least in the largest" CRSs. "Of course, if the owner of a system charges such a high price that no competing airline will pay it, the owner is hurt. It not only loses revenues from that airline; its system will be worth less to travel agents if it contains less information. But the owner may be able to extract a high enough price from competitors to slow their growth; indeed, that may be the purpose of the high prices." Id. at 1115. In sum, the CRS vendor will charge as high a price as it can without losing participating airlines (and thereby decreasing the attractiveness of its' CRS). Similarly, with respect to display bias, the CRS vendor "hope[s] to gain more business by complicating the marketing of competing services *1454 than it would lose to travel agents by providing them with less flight information." Id.
The question is whether the entry barriers to a competing CRS (with respect to access to SABRE agents) are sufficient to qualify SABRE as an essential facility. An entry barrier is either (a) "a condition that makes the long run costs of a new entrant into the market higher than the long run costs of the existing firms in the market", or more broadly, (b) "heavy start-up costs required for entry into the market." Posner, Economic Analysis of Law, section 10.9, p. 290 (3rd ed. 1986). In a hypothetical market without any entry barriers, a seller charging more than his marginal costs (which includes "competitive profits" profits sufficient to maintain the seller's investment in the industry) reaps "monopoly profits" which will attract increased output in the form of new firms entering the market and increased output from firms already in the market. Entry barriers, however, serve to stave off increased industry output beyond the threshold point established in the hypothetical market: that point being when a seller's price is greater than his marginal costs. The seller's ability to reap monopoly profits depends upon the significance of the entry barriers. In this case, the contractual provisions of the SABRE leases raise the cost of entering the market for access to SABRE agents. However, the entry barriers do not foreclose competition in the market. Rather, they raise the cost of entry to the extent that it is expensive for a travel agent to attain dual-CRS capacity.
The significance of the entry barriers, however, are exaggerated by plaintiffs. Assuming that American uses SABRE to weaken competition in the air transportation market by providing biased information, or by charging exorbitant booking fees, there will be an increased incentive for travel agents to attain dual or multiple CRS capability. Moreover, American's anticompetitive action will create an incentive for other CRSs to reduce bias and/or booking fees in an attempt to capture the SABRE agent market. The costs of making SABRE agents dual-CRS-capable can be shared by the agents, airlines and CRS vendors, all of whom have an incentive to widen the market if SABRE is an unattractive product.
While American may be able to extract supracompetitive booking fees in the CRS market, and such price increases do create entry barriers in the air transportation market by raising competitors costs, the entry barrier in the air transportation market is not significant enough to create a danger of monopolization under the circumstances. Just because defendant may be extracting monopoly profits in one market does not inevitably lead to the conclusion that its power in an affected market is also significant enough to confer monopoly power in the related market.
Under Section 2 of the Sherman Act, a firm must provide reasonable access to an essential facility in order to prevent that firm from extending its monopoly power from one market into another. MCI, 708 F.2d at 1132. The evil at which the doctrine is aimed is monopolization of the underlying market. In Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Court recognized that the Sherman Act contains a "basic distinction between concerted and independent action," and that distinction is embodied in sections 1 and 2 of the Act. In Copperweld Corp v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2739, 81 L.Ed.2d 628 (1984), the Court considered the policy differences between claims brought under section 1 and section 2 of the Sherman Act. Section 2 provides:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony. 15 U.S.C. § 2.
In contrast, section 1 provides: "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal ..." 15 U.S.C. § 1.
*1455 The "conduct of a single firm is governed by section 2 alone and is unlawful only when it threatens actual monopolization." Copperweld, 467 U.S. at 767, 104 S.Ct. at 2739. "It is not enough that a single firm appears to `restrain trade' unreasonably, for even a vigorous competitor may leave that impression." Id. Partially because "it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization." Id. at 767-68, 104 S.Ct. at 2740; The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148 (9th Cir.1988) ("a single firm's conduct, absent the danger of monopolization, is not the object of antitrust scrutiny because to treat it with such scrutiny would heighten `the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.'")
The essential facilities doctrine must be tied to the particular statutory provision under which relief is sought. The doctrine itself is an abstraction designed to assist courts in determining whether the statute has been violated. The starting point of statutory construction is the language of the statute itself. Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985); United States v. Hoffman, 794 F.2d 1429, 1431-32 (9th Cir.1986). The plain meaning of the statute is controlling "absent a clearly expressed Congressional intention to the contrary." Hoffman, 794 F.2d at 1432 (citing, North Dakota v. United States, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983)). While section 1 of the Act precludes conspiracies in "restraint of trade," section 2 is targeted at "monopolization." As the Supreme Court has stated, the section 2 standard is less stringent than section 1 because it is often difficult for a court to distinguish between vigorous competition and anticompetitive conduct when analyzing the actions of a single firm. Copperweld, 467 U.S. at 768, 104 S.Ct. at 2740. Thus, the Sherman Act authorizes scrutiny of single firms only when they pose a danger of monopolization. Id. Therefore, when applying the essential facilities doctrine in the context of section 2 of the Sherman Act, a facility should be deemed essential to the downstream market only where control of the facility by a competitor poses a danger of monopolization of the downstream market.
In this case, there is no danger that American will monopolize the market for air transportation. Looking at the facts in a light most favorable to the plaintiffs, American's conduct may restrain trade[4], but it does not threaten monopolization. Even if "entry barriers" to accessing SABRE agents are substantial enough to preclude a single airline from withdrawing from SABRE because SABRE agents will not look to other CRSs (or other sources of information) when making reservations, there is no danger that American will monopolize the air transportation market. As Judge Posner recognized, American is restrained by the existence of competing CRSs. Although there are costs (entry barriers) associated with leasing more than one CRS, these costs only partially insulate American from competition in the SABRE agent market. "[I]f the owner of a system charges such a high price that no competing airline will pay it, the owner is hurt. It not only loses revenues from that airline; its system will be worth less to travel agents if it contains less information." Although the CRS owner may be able to "extract a high enough price from competitors to slow their growth," such a restraint of trade does not violate section 2 of the Act unless it poses a danger of monopolization. The existence of competing CRSs constitute a substitute for SABRE and constrain American's ability to weaken competition in the air transportation market.[5]
*1456 American has never had more than a 14 percent share of the air transportation market. Although market share is, in itself, an insufficient indicator of market power, such a minimal share precludes a reasonable jury from finding monopolization. "There is substantial merit in a presumption that market shares below 50 or 60 percent do not constitute [market] power." P. Areeda & H. Hovenkamp, Antitrust Law, section 518.3c (1986 Supp.) (hereinafter P. Areeda & H. Hovenkamp). A claim that a twelve to fourteen percent market share confers monopoly power is absurd, absent a showing that the air transportation market is characterized by a low elasticity of demand or supply. The large number of competing airlines belies any contention that the industry is faced with low elasticity of supply. The court has also been presented with uncontroverted evidence that the airline industry is highly competitive from the demand side.
The USAir plaintiffs have argued that requiring a dangerous probability of successful monopolization of the underlying market renders the doctrine superfluous. This argument is not well taken. First, whenever courts have applied the doctrine, the facility at issue constituted a bottleneck to competition in the underlying market which created a danger that the facility owner would monopolize the underlying market.
Moreover, a competitor's failure to provide its competitors with access to a facility does not constitute "anticompetitive conduct" absent an essential facilities doctrine. The general rule is that "even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 600, 105 S.Ct. 2847, 2856, 86 L.Ed.2d 467 (1985). Thus, a firm with monopoly power has no general duty to help competitors by "pulling its competitive punches." Olympia Equip. Leasing v. Western Union Tel., 797 F.2d 370, 375 (7th Cir.1986), cert. denied, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987).
However, in some circumstances, failure to cooperate with a competitor may indicate probable anticompetitive effect where the monopolist lacks a business justification for its action. Aspen, 105 S.Ct. at 2859-60; Olympia, 797 F.2d at 378. The particular circumstances in which firms are required to provide a helping hand to its competitors are not well defined in antitrust law. The essential facilities doctrine can be interpreted as a set of requirements[6] triggering a competitor's obligation to cooperate with a competitor. Absent the essential facilities doctrine, a firm's refusal to provide its competitors with access to its facility would not constitute anticompetitive conduct.
Therefore, requiring plaintiffs to show that denial of access to an essential facility creates a danger of monopolization does not render the essential facilities doctrine superfluous. Rather, the doctrine established the conditions for requiring a firm to cooperate with its competitors and thereby rendering the failure to provide reasonable access an anticompetitive act under section 2. Moreover, satisfaction of the doctrine's four internal requirements eliminates the need to prove that the firm had a specific intent to monopolize.

*1457 III. Monopolization[7]

A. Relevant Service Market
A determination of the relevant market usually requires an inquiry into the nature of the product, and the geographical area of effective competition. Oahu Gas Serv., Inc. v. Pacific Resources, Inc., 838 F.2d 360, 364 (9th Cir.1988). Plaintiffs claim that the relevant market in this case is the nationwide market for access to SABRE agents. Defendants argue that the relevant service market is the nationwide market for access to all CRS automated travel agents.
A relevant service market is the smallest service market for which (1) the elasticity of demand and (2) the elasticity of supply are sufficiently low that a firm with 100% of that market could profitably reduce output and increase price. "What is called for is an appraisal of the `cross-elasticity' of demand in the trade." Fount-Wip, Inc. v. Reddi-Wip, Inc., 568 F.2d 1296, 1301 (9th Cir.1978). Thus, products and services which are "reasonably interchangeable" for the same or similar uses normally should be included in the same product market for antitrust purposes. Kaplan v. Burroughs Corp., 611 F.2d 286, 291 (9th Cir.1979).
A particular brand may define a relevant market; "a relevant submarket in one's own products will exist if such a submarket is (a) sufficiently distinct in commercial reality, and (b) is relatively immune from competition of substitutes, or (c) was acquired by means that show an attempt to monopolize." United States v. CBS, Inc., 459 F.Supp. 832 (C.D.Cal.1978). As a legal matter, a firm's own product can constitute a distinct market only where the product is "so unique or so dominant" in the market that control over the product would virtually assure that competition in the market would be "destroyed." Bushie v. Stenocord Corp., 460 F.2d 116, 121 (9th Cir.1972).
A "market" is "any grouping of sales whose sellers ... could raise prices significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the [seller], they are part of the market." P. Areeda & H. Hovenkamp, at 311-12. It is true that products differing in brand name may have certain physical or service based differences which may be substantial. Furthermore, brand recognition may be substantial in many cases. Consequently, differentiated products are not perfectly interchangeable for consumers. "Unlike a perfectly competitive firm, a producer of a successfully differentiated product can raise his price above that of his rivals without losing all of his sales." P. Areeda & H. Hovenkamp, at 316. The question is whether "the degree of power inherent in each differentiated product is sufficient to make each brand a separate market for ... monopolization purposes? The answer is almost uniformly negative." Id. at 316-17. The reason is, from a policy perspective, legal rules limiting a monopolist cease to make sense when applied to every producer of a differentiated product. From an economic perspective, producers engage in product differentiation because they are involved in a highly competitive market and are merely attempting to compete with other brands. Product differentiation is a public good created by competitive markets, and not an indication that competition is lacking in the product market. Id.
The ultimate question is whether other existing or potential CRSs significantly constrain the price-raising power of American. If the answer is yes, then these other CRSs must be grouped in the same "market" as SABRE.[8] However, if the other CRSs do not impair SABRE's ability to control prices or exclude competition, then the other CRSs can not be viewed as substitutes for SABRE.
The Supreme Court has suggested the following factors when determining the relevant market:

*1458 The boundaries of such a submarket[9] may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.
Brown Shoe v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1961); Kaplan, 611 F.2d at 292-93. Continental supports its claim that access to SABRE agents is a distinct service market by applying these factors.
There is evidence that the industry recognizes access to SABRE as a separate service from access to other CRSs. The fact that almost all airlines participate in virtually all CRSs is evidence that each airline perceives each CRS as a different service. Moreover, when United, TWA and American raised their booking fee to $1.75, no airline elected to participate in one of the lower priced CRSs (Eastern's SystemOne and Delta's DATAS II had rates of $ .75) and bypass Apollo or SABRE. Rather, all airlines continued to participate in both systems. Evidence that American engaged in price discrimination prior to enactment of the 1984 CAB rules is also evidence that carriers perceive the different CRSs as constituting different services. Finally, Continental points to evidence that American set its booking fees without regard to prices set by other CRS vendors. Despite disparity in pricing, demand for access to SABRE has not gone down. The apparent reason, according to Continental, for the low elasticity of demand is that access to SABRE provides a carrier with virtually the only practical access to SABRE-automated travel agents, since more than 90% of all SABRE agents only use SABRE.
The evidence amassed by Continental, however, does not support its contention that a reasonable jury could not find a broader market (such as the market for access to all CRS-automated travel agents) to be relevant in this case. Market definition is essentially a question of fact dependent upon the special characteristics of the industry involved. Oahu, 838 F.2d at 363 (citations omitted). The evidence provided does not compel a factfinder to conclude that other CRSs do not constrain American when it establishes booking fees for SABRE.
Continental's argument is based upon a static reading of the CRS market. The historical fact that almost all SABRE agents have only one CRS and that almost all carriers participate in virtually all of the major CRSs is not indicative of market power. The apparent low elasticity of demand is meaningless unless it is complemented by low elasticity of supply.
[D]efining a market ... on the basis of demand considerations alone is erroneous. The function of defining a market is to determine that grouping of sales which, if controlled by a single firm ..., could charge noncompetitive prices. But that is not possible if either demand or supply elasticity are high. Exploitative prices cannot be maintained on, say, children's shoes, if high prices induce consumers to shift to other products or induce producers of men's or women's shoes to make children's shoes.
P. Areeda & H. Hovenkamp, at 319.
Thus, although current market conditions suggest low demand elasticity, the existence of alternative channels of distribution such as competing CRSs indicate high supply elasticity. CRSs such as Apollo, PARS, DATAS II, and SystemOne provide essentially the same services as SABRE, except that SABRE is used in more travel agencies than the other CRSs. If SABRE began charging supracompetitive prices, then airlines would abandon SABRE, causing SABRE-automated travel agents to look to other CRSs. The existence of the other CRSs, therefore, constrain *1459 American's ability to set supracompetitive prices for SABRE. The existence of alternative CRSs suggests high supply elasticity, so there exists at least a factual dispute as to whether the relevant market is "access to SABRE agents."
The more interesting question is whether the court should characterize the market for CRS access as the relevant market as a matter of law. Although market definition is a factual matter, it is often properly decided on summary judgment because issues of market definition do not involve questions of motive or intent. General Business Systems v. North American Phillips Corp., 699 F.2d 965 (9th Cir.1983) (affirming granting of summary judgment for failure to present evidence of a relevant market). The question is whether a reasonable jury could conclude that access to SABRE agents is a distinct service market, when viewed in the light most favorable to plaintiffs.

Entry Barriers to Accessing SABRE-Agents
Plaintiffs have presented evidence that certain entry barriers preclude other CRS vendors from competing with American for access to SABRE agents. The existence of entry barriers suggest that elasticity of supply is low, despite the presence of alternative distribution channels. This conclusion is based upon the alleged "captive customers" relationship between SABRE and the SABRE-automated agents, maintained through long-term contracts and high liquidated damage clauses.
As stated earlier, plaintiffs argue that access to SABRE-automated agents is impaired through contractual provisions and the costs involved in making travel agents dual-CRS-capable. In defining a "market" the court must look to all products which substantially constrain the price-setting ability of the seller. Even if certain SABRE agents are stuck with long term contracts, American must make its product attractive to new travel agencies, SABRE agents whose contracts are expiring, and SABRE agents who can afford the extra expense of obtaining a second CRS. SABRE-automated agents can become ex-SABRE-automated agents as their contracts expire, or as they chose to become dual-CRS-capable. Competing CRSs can quickly expand output merely by setting up a terminal at the travel agent's office. Indeed, the virtual non-existence of start-up costs[10] would permit a competing CRS to bear some of the financial burden of making a SABRE-agent dual CRS capable.
Defendants argue that plaintiffs' claim that SABRE is a separate market for purposes of section 2 must be based upon a further, unstated, assumption: that SABRE-automated travel agents have a "captive" group of customers who buy all their air transportation through the SABRE-agents, even if the SABRE-agents do not provide a competitive level of service. If consumers are not somehow held captive by their travel agents, then basic economic theory holds that they will seek out the best service available. There is no evidence that consumers are held captive by travel agents. The consumer's freedom effects the entire system so that travel agents will demand better service from its CRS vendor, and if such service is not given, the agent will either seek alternative methods for booking flights (other CRSs, direct booking by telephone, etc.), or go out of business and make way for more competitive travel agents. This competitive pressure constrains American from charging supracompetitive prices to the carriers because the CRS vendor needs to provide access to its CRS in order to make the service attractive to travel agents. Therefore, as long as the consumer is not held captive, the CRS vendor must compete with other CRS vendors. In this case, there is no evidence that consumers are held captive by travel agents.
Defendants' theory accurately shows that American is constrained by the existence of competing CRSs. However, the *1460 question is not whether there is any form of constraint, but whether American is precluded from charging monopoly prices. While entry barriers exist and impose additional costs for entering the market, the difficult factual question is whether the barriers are high enough to allow monopoly pricing. American may be able to extract booking fees high enough to slow the growth of their airline competitors, but low enough to make participation in the system cost efficient for the carrier. See, United Airlines v. C.A.B., 766 F.2d at 1114. The test for monopoly pricing is not whether participation in the system is cost efficient for the carrier (it must be, otherwise the carrier would not participate), but whether the price is significantly higher than the seller's marginal cost. The existence of entry barriers for access to SABRE agents creates a material issue of fact as to whether other CRSs are effective substitutes for access to SABRE.
The evidence, interpreted in a light most favorable to plaintiff, could permit a reasonable jury to conclude that SABRE is a separate service market because there is evidence that airlines view each CRS as offering a unique service: access to a particular set of travel agents. A reasonable jury may conclude from the evidence that SABRE automated agents are locked into SABRE (through contractual provisions) and that American is free to extract supracompetitive booking fees from participating airlines, although the fees are not high enough to justify abandoning the system. Thus, defendants are able to set booking fees at a supracompetitive rate, and consumers will not abandon SABRE agents because the travel agency's services are not effected since supracompetitive prices are high enough to slow an airlines growth, but low enough to remain economically cost-efficient for the airlines.

B. Elements of Monopolization
The elements of monopolization under section 2 of the Sherman Act are (1) possession of monopoly power in a relevant market; (2) wilful acquisition or maintenance ("use") of that power; and (3) causal antitrust injury. Catlin v. Washington Energy Co., 791 F.2d 1343, 1347 (9th Cir.1986) (citations omitted).

1. Monopoly Power
Monopoly power focuses generally on a firm's ability to "control prices or exclude competition." Oahu, 838 F.2d at 366 (citations omitted). Courts have employed the following evidentiary methods in order to determine whether a defendant has market power in the relevant market; proof that defendant accounts for a high percentage of total firm sales within the market ("market share"), defendant's actual exercise of price leadership control over the industry, affirmative actions taken by defendant that has excluded actual or potential competitors, profit levels, barriers to competition in the industry that would thwart new entry at the expansion of existing competitors, and historical trends within the industry. Holmes, supra, at 148-49.
Inquiries in this area often depend heavily upon market share and barriers to entry. Oahu, 838 F.2d at 366. "A firm with a high market share may be able to exert market power in the short run, but `[s]ubstantial market power can persist only if there are significant and continuing barriers to entry.'" Id. (quoting, 2 P. Areeda & D. Turner, Antitrust Law, at section 505). A high market share will not raise an inference of market power in a market with low entry barriers or other evidence of defendant's inability to control prices or exclude competitors. Oahu, 838 F.2d at 366. "By the same token, `[a]declining market share may reflect an absence of market power, but it does not foreclose a finding of such power.'" Id. (quoting, Greyhound Computer Corp. v. International Business Machines Corp., 559 F.2d 488, 496 n. 18 (9th Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978)).
Market share is used as a surrogate for information which, if available, would provide a more accurate assessment of a firm's market power. Thus, if a firm's market elasticities (supply and demand) could be shown directly, there would be no *1461 need for extrapolating market power from market share. Landes & Posner, Market Power in Antitrust Cases, 94 Harv.L.Rev. 938, 953 (1981). If a firm's marginal cost could be ascertained, its exercise of market power would be revealed merely by subtracting the price actually charged from the marginal cost of production. Id. These figures, however, are notoriously difficult (if not impossible) to determine. Therefore, courts look to market share in a relevant market as an effective surrogate for direct measurement of market power. P. Areeda & D. Turner, section 507, at 330-31.
If the relevant market may be access to SABRE agents, then defendant controls 100% of the market, and included in the determination of "relevant market" is a finding that other CRSs may not be effective substitutes for SABRE. Thus, there is a material issue of fact as to whether SABRE has market power because there is a material issue as to whether access to SABRE automated agents is a relevant market.
If the relevant market is the national CRS market, then plaintiffs must show that American has market power despite its relatively small share of the market. SABRE's share of Computerized Reservation Terminals has never exceeded 44.2%, and it appears to be declining.[11] Plaintiffs argue, however, that the market share figures do not accurately represent American's market power. Thus, plaintiffs point to the actual exercise of market power as evidence of American's monopoly power.

Evidence of Market Power
First of all, there is direct evidence of the defendants' exercise of monopoly power in the CRS market. The recent Department of Transportation Report shows that defendants price booking fees above marginal cost. The report indicates that SABRE's booking fees equal 233 per cent of their average costs for producing reservations during 1986, and Apollo's booking fee constitutes 192 per cent of its costs for producing reservations. These results, however, do not mandate a finding of market power, as a matter of law, because the Report itself details the complications in allocating costs between booking transactions and supporting agency subscribers. Nevertheless, these factual findings preclude the court from finding, as a matter of law, that defendants do not have market power in the CRS market.
Plaintiffs also point to evidence that American engaged in price discrimination prior to the enactment of the 1984 CAB rules.[12] Price discrimination is "a term that economists use to describe the practice of selling the same product to different customers at different prices even though the cost of sale is the same to each of them." R. Posner, Antitrust Law, 63 (1976). Price discrimination in sales of the same product can not last long in a competitive market because other sellers of the same product have an incentive to sell the product at a competitive rate to the victims of price discrimination. R. Posner, Antitrust Law, at 63 ("persistent price discrimination is very good evidence of monopoly because it is inconsistent with a competitive market"). Therefore, price discrimination usually can not occur in a competitive market for very long. P. Areeda & D. Turner, section 513, at 341-42.; Coal Exporters Ass'n of the United States, Inc. v. United States, 745 F.2d 76, 91 (D.C.Cir.1984), cert. denied, 397 U.S. 907, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985) ("it is well established that the ability of a firm to price discriminate is an indicator of significant monopoly power").
*1462 There is evidence that American engaged in price discrimination. For example, Eastern Airlines became a co-host on SABRE in March 1981, at a fee of 24 cents per booking. Delta Airlines, which competed with American at the Dallas/Ft. Worth hub, became a participating carrier on SABRE in October 1982 only after agreeing to a fee of $1.32. New York Air agreed to pay a $2.00 booking fee in December 1981.
The issue in both the market definition and monopoly power area is whether American is constrained from charging monopoly prices by the existence of alternative distribution channels. The ability to engage in price discrimination is an indication that American has market power. Whether the degree of market power rises to the level of monopoly power, however, is a detailed factual question which involves a weighing of the evidence. In response to charges of price discrimination, American argues that different prices were the result of individually negotiated contracts where some airlines had more bargaining power based upon the benefits to American created by their participation in SABRE.
In this case, evidence of price discrimination is not a compelling indication of market power. In a typical case of price discrimination, the value of the product in issue is not effected by the purchase of the product. That is, the fact that Buyer purchases a widget does not increase the value of the widget such that the market value of the widget increases because of the purchase by the particular Buyer. However, the value of SABRE is enhanced by each subscriber because the number of subscribers directly increases the market value of the product to travel agents, and consequently, to other airlines. In effect, a major airline gives American something of value merely by subscribing to SABRE. A lesser airline's participation does not increase the value of the CRS as much because that flight information is not as valuable to the CRS. Therefore, the subscription price does not reflect American's entire compensation for providing SABRE services to its subscriber.
The evidence shows that Eastern became a co-host at a fee of 24 cents per booking in March 1981. SABRE's booking fee increased, so that New York Air was charged a $2.00 booking fee in December 1981, and Delta was charged $1.32 per booking in October 1982. However, neither New York Air nor Delta became "co-hosts", and their participation began after SABRE had established itself in the market. In 1981 and 1982 the CRS market was just establishing itself, and PARS was really the only other CRS, aside from Apollo and SABRE, in the market.[13] Above cost pricing and price discrimination is expected at this stage of market development. If the pricing was in fact supra-competitive it would serve to attract new entrants into the market. In fact, such new entry did take place when DATAS II and SystemOne entered the market and began to chip away at SABRE's and Apollo's market shares.[14]
Defendant's exercise of price discrimination supports plaintiffs' allegation that defendant had market power, although under the circumstances it is not compelling. A reasonable jury could conclude that defendant's exercise of price discrimination was indicative of market power, however, a reasonable jury could also come to the opposite conclusion.
Finally, whether the relevant market is deemed to be the market for access to SABRE automated travel agents, or the market for access to CRS automated travel agents, plaintiffs have presented evidence indicating that competing CRSs may not be effective substitutes for SABRE. Thus, the discussion relating to whether SABRE is a distinct service market also supports plaintiffs' argument that defendants have monopoly power in the CRS market. The evidence indicates that the other CRSs may not constrain SABRE since the other CRSs *1463 are not substitutes for SABRE. Although not compelling, the evidence precludes a finding that defendants do not have monopoly power as a matter of law.

2. Wilful Acquisition or Maintenance of that Power
The second element of monopolization under section 2 of the Sherman Act is "the wilful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." United States v. Grinnell, 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); Oahu, 838 F.2d at 367-68. The question of whether conduct is anticompetitive is a question of law. Oahu, 838 F.2d at 368 (reversing judgment against defendant monopolist on the ground that conduct was not anticompetitive as a matter of law).
Section 2 of the Sherman Act does not prohibit "monopoly" itself ("monopoly in the concrete"), Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 62, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911); rather, it prohibits conduct directed at "smothering competition." Berkey Photo, Inc. v. Eastman Kodak, Inc., 603 F.2d 263, 275 (2d Cir.1979). Conduct which may not be unlawful in itself may be illegal when done by a monopolist because it tends to destroy competition. Lorain Journal & Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).
Plaintiffs contend that American engaged in predatory pricing through which it attained its monopoly power. "Predatory pricing" refers to a firm's attempt to drive a competitor out of business, or to discourage a potential competitor from entering the market, by selling its output at an artificially low price. The theory is that once the rival has been dispatched from the market, the predator will be able to reap monopoly profits which will more than pay for the losses incurred during the predatory period. Price reductions that constitute a legitimate, "competitive response" to market conditions are competitive, not predatory. William Inglis and Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1031 (9th Cir.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). "Pricing is predatory only where the firm forgoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits ..." Janich Bros., Inc. v. American Distilling Co., 570 F.2d 848, 856 (9th Cir.1977), cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).
While the Ninth Circuit has adopted the Areeda-Turner theory, it has also modified the test. Inglis, 668 F.2d at 1032 (citing cases). The general rule is that a price should be considered predatory "if its anticipated benefits depend on its tendency to eliminate competition." Inglis, 668 F.2d at 1034. If the justification for a price reduction did not depend upon this anticipated effect, then it does not support a claim of illegal monopolization or attempted monopolization. Predatory pricing may be proven, without reference to evidence of subjective intent, by examining the relationship between the defendant's prices and costs. "But such proof must tend to show that the anticipated benefits of the prices, at the time they were set, depended on their anticipated destructive effect upon competition and the consequent enhanced market position of the defendant." Inglis, 668 F.2d at 1034.[15] Ultimately, "cost-based" inquiries serve merely as "an aid in determining the ultimate question: Did the justification for the defendant's price depend upon its anticipated destructive effect on competition, or was the price justified as a reasonably calculated means of maximizing profits minimizing losses, or achieving some other legitimate end?" Inglis, 668 F.2d at 1038. However, the cost-based analysis establishes the burden *1464 of proof on the issue of predation: "If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors." Inglis, 668 F.2d at 1036. In this Circuit, therefore, all of the Areeda-Turner presumptions are rebuttable by a showing of predatory or nonpredatory purpose.
Continental claims that American engaged in predatory pricing in the following manner; (1) American provided SABRE services to other airlines for free, and (2) American provided SABRE to travel agents below cost.
In determining whether American was forgoing short-term profit in order to later reap monopoly profits, it is first necessary to examine the nature of SABRE. SABRE is a "joint" product which provides services to both travel agents and airlines. Thus, a determination that American was pricing below cost must account for American's cost allocation decisions.
The cost initially charged to travel agents was designed merely to recover the costs of automating the agent. However, Apollo and SABRE began cutting prices as they competed for access to travel agents. American also began by providing free SABRE services to other airlines in order to increase the value of SABRE to travel agents. This evidence indicates that American was pricing SABRE below its marginal costs in order to gain a foothold (or chokehold) in the market.
The next question is whether American engaged in below cost pricing so that it could later increase its prices and recoup lost profits. The evidence permits an inference that American provided free services to airlines and sold SABRE to travel agents below costs in order to allow penetration of the CRS market through which it could recoup its lost profits by engaging in display bias (and later, supracompetitive booking fees). It appears that American decided to provide SABRE to travel agents at less than marginal cost, and planned on allocating to the participating airlines the bulk of its costs through display bias. However, it is clear that American provided SABRE services for free at its inception. A reasonable jury could infer that below cost pricing was taking place, and that it was undertaken for the purpose of later recouping lost profits through monopoly overcharges primarily through display bias. Therefore, there is a material issue of fact as to whether American engaged in anticompetitive conduct to attain or maintain its monopoly power.
Continental argues, as another ground for finding a factual issue as to anticompetitive conduct, that American's contracts with travel agents were meant to lock in SABRE subscribing agents through long term obligations and high liquidated damages provisions. American allegedly engaged in this type of behavior in order to lock in travel agents so that it would be free to increase display bias without seriously risking loss of subscribing travel agents. The contractual practices, in conjunction with the evidence of below cost pricing, permits an inference that American wilfully attempted to attain or maintain its monopoly power by tying up its participating travel agents.

Possibility of Wilful Acquisition or Maintenance of Monopoly Power
Plaintiffs' theory is that SABRE is its own relevant market because competition in the air transportation market is so intense that no airline can afford to abandon a CRS system with a five or ten percent CRS market share. Defendant argues that this claim amounts to an admission that plaintiff can not show that wilful acquisition or maintenance of monopoly power, as distinguished from growth or development as a consequence of a superior product, historical accident or business acumen.
*1465 There are two possible sources of defendants' market power. First, it is possible that all CRS vendors have market power due to vigorous competition in the air transportation market, which requires all airlines to be carried on each significant CRS, and the non-existence of a market mechanism[16] which would make travel agents sensitive to costs incurred by participating airlines. If this is the source of market power, then there can be no antitrust liability under section two because market power was not caused by or maintained due to any anticompetitive conduct. In other words, defendants' market power is due solely to existing market conditions in the air transportation business and the costs associated with making travel agents dual-CRS capable. However, there is a second basis for the attainment of market power which is based upon SABRE's implementation of coercive contractual provisions which may have raised entry barriers and created, or allowed defendants to maintain, monopoly power. The entry barriers created by such contractual practices, in conjunction with the general market conditions in the air transportation industry, are alleged to have created defendants' monopoly power.
The evidence supporting plaintiffs' claim that SABRE is its own relevant market is that each CRS is a separate and distinct channel for distributing airline flight information to travel agents because it is inefficient for travel agents to have more than one system, American's contractual practices prevent travel agents from freely switching to competing CRSs, and the intensely competitive air transportation market precludes an airline from abandoning a system which effectively provides the sole source of access to a significant percentage of travel agents.
American's acquisition and maintenance of monopoly power was not inevitable under this theory. If SABRE automated travel agents were free to purchase CRS services from the most efficient purveyor of such services, then a particular airline would have the power to abandon SABRE and the SABRE automated agent would have an incentive to replace SABRE with a more valuable CRS. In this manner, American would be significantly constrained by the existence of other CRSs. However, plaintiffs complain that the onerous contractual provisions, in conjunction with alleged predatory pricing, have locked-in travel agents to SABRE and, in this manner, have effectively prevented normal market factors from functioning. This has the effect of reducing the power of participating airlines from negotiating competitive booking fees because their bark is not supported by any possible bite. If a particular airline abandons SABRE, the SABRE agents will not shift to another CRS because of the onerous contractual provisions. Thus, under plaintiffs' theory, onerous contractual provisions and predatory pricing have made possible a situation in which SABRE may be deemed to constitute its own market, or deemed to have market power in the CRS market.

3. Causal Antitrust Injury
An antitrust plaintiff must prove (1) injury causally linked to a violation of the antitrust laws, and (2) that the injury is of the "type" the antitrust laws were intended to prevent. California Computer Prod. v. International Business Machines, Corp., 613 F.2d 727, 732 (9th Cir. 1979) (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)).

Causal Link to Antitrust Violation
The plaintiff's burden of proving a causal link between the antitrust violation and its injury is satisfied "by proof of some damage flowing from the antitrust violation." California Computer Products, 613 F.2d at 732 (citing Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969)).
*1466 There is evidence that defendants post-Rule booking fees were supracompetitive, and that bias diverted revenues constituted a monopoly overcharge. This represents a direct injury caused by monopoly power.

Antitrust Injury
The Supreme Court has held that not all forms of injury caused by antitrust violations are compensable. In Brunswick, the Court held that an antitrust plaintiff must show that it was injured by the anticompetitive consequences of the antitrust violation. Brunswick, 429 U.S. at 488, 97 S.Ct. at 697. Plaintiff must show that "the injury was caused by a reduction, rather than an increase, in competition flowing from the defendant's acts, since `[t]he antitrust laws ... were enacted for "the protection of competition not competitors."'" California Computer Prod., 613 F.2d at 732 (citations omitted).
Injury caused by supracompetitive pricing is the type of injury which the antitrust laws were intended to prohibit. In this case, the participating airlines are injured as consumers of CRS services by paying supracompetitive rates. A reasonable jury may conclude that defendants' willful acquisition of monopoly power has permitted them to extract monopoly prices from airlines. Thus, plaintiffs are injured by the anticompetitive consequences of the antitrust violation.

IV. Monopolization Re: United
United has moved for summary judgment against plaintiffs' claims that it monopolized five alleged markets: (1) the national market for the provision of CRS services to travel agents and airlines; (2) local markets for the provision of CRS services to travel agents and airlines[17]; (3) that market for the provision of Apollo services to airlines; (4) that national air transportation market; and (5) various local air transportation markets.
Plaintiffs have provided no competent evidence supporting a claim that United monopolized the national air transportation market. Summary judgment is appropriate. See, supra, discussion of claim against American.
Plaintiffs have also failed to provide evidence that United has monopolized various local air transportation markets, or that these are relevant markets. Summary judgment is appropriate.
Plaintiffs have produced evidence creating a factual issue as to whether United has monopolized the national market for the provision of CRS services to travel agents and airlines, or that United has monopolized the market for access to Apollo agents. This claim mirrors the claim against American, See above, and summary judgment is not appropriate.
Finally, plaintiffs claim that United has monopolized certain local markets for the provision of CRS services to travel agents and airlines. The threshold question is whether local CRS markets are relevant markets for antitrust purposes.
In order to prove monopolization, plaintiffs must show that defendants possess monopoly power in "a relevant market." Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 736 (9th Cir.1987). Relevant market is a factual issue to be determined by the jury, so summary judgment is only appropriate where a reasonable jury could not find the alleged market to be a relevant market.
The commercial realities of the industry are the major factors in determining the relevant geographic market. Ralph C. Wilson Industries v. Chronicle Broadcasting Co., 794 F.2d 1359, 1363 (9th Cir. 1986). In United States v. Grinnell Corp., 384 U.S. 563, 576, 86 S.Ct. 1698, 1706, 16 L.Ed.2d 778 (1966), defendant was accused of monopolizing the local market for the provision of home security services. The Court, however, rejected the argument that the relevant geographic market was local. While the court recognized that the activities of individual stations are local in that they patrol an area with a 25 mile radius, *1467 the record evidence "support[ed] the conclusion that the business of providing such a service is operated on a national level." Defendant engaged in national planning, was subject to inspection, certification and rate-making by national insurers, had a national schedule of prices, rates, and terms, although such rates could be varied to meet local conditions, and it dealt with multistate businesses on the basis of multistate contracts. Id. at 576, 86 S.Ct. at 1706.
Apollo is marketed nationwide and the service is uniform throughout the country. The evidence supporting a finding that the relevant geographic market is local is that Apollo's local market share is greater in certain local areas. Apollo's local dominance tracks areas in which United enjoys a significantly large local market share. The CAB found that there is "abundant evidence that, from the perspective of travel agents and air carrier purchasers, as well as the CRS suppliers, the area of effective competition is far narrower than nationwide." CAB Final Rule, In Lim.App. 766. However, the Department of Transportation Report indicates that between 1983 and 1986 "the vendors' market shares in large and medium hubs were far from static." DOT Report at 116. The statistics indicate that SystemOne and PARS made dramatic headway in the large and medium hubs. Thus, evidence of large market shares in certain hubs must be balanced by erosion of such market shares through competition.
Plaintiff has merely provided evidence indicating defendants have a large market share in a number of local markets. As United points out, the argument is akin to suggesting that if a plaintiff claims that the defendant sells 60% of the coffee pots in San Diego, the court should automatically assume with respect to coffee pots that San Diego constitutes a relevant geographical market. Evidence of market share, however, is only important after the relevant market has been defined. Plaintiffs have not presented evidence showing that competition in the CRS market is anything but national in scope. Therefore, the local markets are not relevant and summary judgment is appropriate.[18]

V. Attempted Monopolization
An attempted monopolization claim must show (1) specific intent to monopolize a relevant market, (2) predatory or anticompetitive conduct, and (3) a dangerous probability of success. Catlin v. Washington Energy Co., 791 F.2d 1343, 1348 (9th Cir.1986).

A. Attempt to Monopolize Air Transportation Market
Summary judgment is appropriate because plaintiff has failed to present any evidence supporting the dangerous probability of success element. The air transportation market is intensely competitive and defendant's market share has never reached 12%. Judge Learned Hand's famous dictum is at least instructive: While over ninety percent "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not." Clearly, twelve or fourteen percent is not enough to create a dangerous probability of success.

B. Local Air Transportation Markets
The USAir plaintiffs have acknowledged that the national market is the only relevant air transportation market in this case. USAir Plaintiffs' Statement of the Case, Dec. 30, 1985 at 7 ("the air transportation market is national in scope ..."); PSA's Brief in Opposition to American's Motion for Summary Judgment, April 22, 1985 at 3-4.
Continental, however, has identified four markets which they claim American has attempted to monopolize: (1) air transportation to and from Dallas/Ft. Worth; (2) air transportation between Chicago and Los Angeles ("LA"); (3) air transportation between LaGuardia Airport and Chicago; and (4) air transportation between LaGuardia and Detroit.

*1468 Elements of Attempted Monopolization

A claim for attempted monopolization under section two consists of three elements: (1) specific intent to control prices or destroy competition, (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose, and (3) a dangerous probability of success. Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 736 (9th Cir.1987). "An allegation of monopoly power is an explicit requirement of attempted monopolization and may be an implicit requirement of attempted monopolization's third prong relating to dangerous probability of success." Id. However, the weight of authority in this circuit holds that dangerous probability of success can be inferred from proof of specific intent and anticompetitive conduct. California Computer Prod., 613 F.2d at 737; Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).
In Lessig, the court stated:
When the charge is attempt (or conspiracy) to monopolize, rather than monopolization, the relevant market is "not in issue." ... Section 2 prohibits attempts to monopolize "any part" of commerce, and a dominant position in the business of distributing petroleum products and TBA [tires, batteries, and automotive accessories] was not necessarily prerequisite to ability to attempt to monopolize an appreciable segment of interstate sales in such products.
Id. at 474-75. This sweeping language, however, has been cut back in recent years. Under the "modified Lessig doctrine", a showing of relevant market is required "in circumstances where the conduct of the attempted monopolizer is ambiguous or not clearly predatory." Blanton v. Mobil Oil Corp., 721 F.2d 1207, 1214 (9th Cir.1983), cert. denied, 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985).
Continental has failed to present evidence supporting its contention that a city pair or hub constitutes a relevant market in the air transportation industry. In fact, Continental's own expert (Franklin Fischer) has testified that a city pair cannot be a relevant market absent unusual circumstances, such as slot-constrained airports and the absence of a market for slots at those airports. Plaintiffs' expert Fischer has also stated that a city or hub cannot constitute a relevant market either. A hub is merely a place to change planes during air travel between two other cities. Airlines do not sell air transportation to hubs, rather they sell air transportation between cities. A city is not a market because a "city" is merely a collection of many city pairs that include that city. Plaintiffs have failed to present any evidence supporting their claim that these hubs and city pairs constitute relevant markets.
Therefore, plaintiffs must show (1) specific intent to monopolize a hub or city pair, (2) predatory conduct or anticompetitive conduct directed to the accomplishment of that purpose, and (3) that defendant's conduct is not ambiguous and is clearly predatory. Greyhound Computer v. I.B.M., 559 F.2d 488, 504 (9th Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); Blanton, 721 F.2d at 1214.

(1) To-From Dallas/Fort Worth
Plaintiffs have presented facts sufficient to support its contention that American attempted to monopolize the Dallas/Fort Worth (DFW) hub. In United States v. American Airlines, 743 F.2d 1114 (5th Cir. 1984), cert. dismissed, 474 U.S. 1001, 106 S.Ct. 420, 88 L.Ed.2d 370 (1985), the court reversed the district court's dismissal of the government's action against American for attempted monopolization. The same facts alleged in that case are also presented in this action.
In February 1982, American and Braniff Airlines each had hubs at DFW. Together, American and Braniff had more than ninety percent of the passengers on non-stop flights between DFW and eight major cities, and more than seventy percent of all passengers between DFW and seven other cities. Overall, American and Braniff accounted for seventy-six percent of monthly enplanements at DFW. United States v. American Airlines, 743 F.2d at 1116. American and Braniff were "competing *1469 fiercely for passengers flying to, from and through DFW, by offering lower fares and better service." Id. In February of 1982, American's president Robert Crandall and Braniff's president Howard Putnam had a telephone conversation in which Crandall suggested that Braniff raise its fares:
Putnam: Do you have a suggestion for me?
Crandall: Yes. I have a suggestion for you. Raise your goddamn fares twenty percent. I'll raise mine the next morning. Crandall also stated that, "We can, we can both live here and there ain't no room for Delta. But there's, ah, no reason that I can see, all right, to put both companies out of business."
Id.
During this conversation, American's president provides evidence of both specific intent to monopolize DFW, and evidence of anticompetitive conduct. First, Crandall indicates that a competing airline (Delta) should be eliminated so as to reduce competition and enable both American and Braniff to raise their fares. Second, Crandall's price fixing solicitation is a textbook example of anticompetitive conduct.[19] Thus, there is evidence that American had a specific intent to monopolize the market and that it engaged in "clearly anticompetitive conduct." Since there is evidence of these two elements, there is no need for plaintiff to define a relevant market.
The final element is dangerous probability of success. Proof of a relevant market is not required in this Circuit whenever plaintiff can show both specific intent to monopolize and anticompetitive conduct in furtherance of that goal. Thus, "dangerous probability of success" does not require a showing that DFW is a relevant market. All plaintiff needs to show is that there is a dangerous probability that defendant will succeed in monopolizing DFW. There is competent evidence supporting plaintiffs' claim; (1) there were significant access restrictions at DFW in 1982; (2) American's market share rose from 30% to 63% during this period of time; and (3) three different airlines left the market during American's alleged anticompetitive conduct. On this basis, there appears to be a factual dispute as to whether American attempted to monopolize the DFW market.

(2) LaGuardia AirportDetroit
Plaintiff contends that American attempted to monopolize the LaGuardia/Detroit city pair market. Continental points to American's president's statement that American lost $4 million in four months in order to drive New York Air out of the LaGuardia/Detroit market so as to "send a message" to New York Air that if it ever dared to enter the LaGuardia/Chicago market American would destroy them.
The evidence shows that American, according to its president, engaged in below-cost pricing in order to exclude New York Air from the LaGuardia/Detroit market. This evidence satisfies Continental's burden as to the specific intent element.
The next question is whether defendant's conduct was "clearly predatory or anticompetitive." The only evidence of anticompetitive conduct is Crandall's statement that American lost $4 million dollars in the LaGuardia/Detroit market so as to send a message to New York Air that they would be destroyed if they entered the LaGuardia/Chicago market. This is circumstantial evidence that American engaged in predatory pricing. Such evidence is not clear enough to trigger an inference that American has a dangerous probability of success.
Plaintiff has made no showing that American has a dangerous probability of success. First of all, plaintiff has failed to show that either the LaGuardia/Detroit or LaGuardia/Chicago city pairs constitute relevant markets. Moreover, even if these city pairs are assumed to be relevant markets, plaintiff has failed to show that there is a dangerous probability of monopolizing these markets.
*1470 Continental merely points to evidence that New York Air was driven from the LaGuardia/Detroit market due to defendant's actions. Harm to a competitor, in itself, does not constitute a violation of the antitrust laws, and is not indicative of monopoly power. Even assuming that LaGuardia/Detroit is an independent market, plaintiff makes no showing that (1) American has a significant market share, and (2) that there are barriers to entering the market. Without a showing of significant barriers to entry, plaintiff's characterization of defendant's conduct as predatory makes no economic sense.[20] Summary judgment is appropriate.

(3) LaGuardia/Chicago
The evidence supporting plaintiffs' claim that American has attempted to monopolize the LaGuardia/Chicago market is based upon the same evidence as the LaGuardia/Detroit claim. Similarly, plaintiffs have failed to show clearly predatory conduct in furtherance of its intent to monopolize the market, and plaintiffs have failed to show that the city pair is a relevant market. Finally, even if the city pair constitutes a relevant market, there is no factual basis supporting plaintiffs inference that American engaged in predatory conduct. However, the allegation of predatory pricing makes no economic sense because there is no showing that American has a significant market share and that there are barriers to entry. Thus, summary judgment is appropriate.

(4) Chicago/Los Angeles
Plaintiff points to no evidence of specific intent to monopolize the Chicago/Los Angeles market. Plaintiff argues that intent to monopolize can be "inferred" from evidence of intent to monopolize the other markets. There is no legal support for such an inference.
As to predatory or anticompetitive conduct, plaintiff points to Continental's exit from the market. This evidence is also advanced in favor of the dangerous probability of success element.
Summary judgment should be granted in favor of American because plaintiff has failed to provide evidence sufficient to support a jury finding on any of the elements for attempted monopolization of the Chicago/Los Angeles market.

C. Attempted Monopolization: UNITED AIRLINES
Continental claims that United has attempted to monopolize the following markets: (1) the national CRS market; (2) local CRS markets; (3) the national air transportation market; and (4) various local CRS markets[21]: (i) Denver hub, (ii) the north-south West Coast corridor, (iii) the Honolulu-Los Angeles, Chicago-Los Angeles, Chicago-LaGuardia and LaGuardia-Cleveland routes. Defendant moves for summary judgment as to all these allegations.
As a preliminary matter, Continental argues that the motion must be denied because defendant has failed to cite record evidence supporting its motion. However, a party seeking summary judgment need not negate its opponent's claims where the opponent carries the burden of proof, it need only show that there is no probative evidence to support the claims. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

1. National CRS Market

(i). Specific Intent

Specific intent to monopolize can be inferred from defendant's market power or predatory or anticompetitive conduct directed to accomplishing the unlawful purpose (monopolization). California Computer Prod., 613 F.2d at 737. Since there is a material issue of fact as to whether Apollo has monopoly power in the CRS *1471 market, then specific intent to monopolize can be inferred from market power. (See, discussion of monopoly power). Similarly, specific intent can also be inferred from predatory or anticompetitive conduct. (See, below)

(ii). Predatory or Anticompetitive Conduct

There is competent evidence supporting plaintiffs' claim that defendant engaged in predatory or anticompetitive conduct. See, supra, discussion concerning Unlawful Maintenance or Acquisition of Monopoly Power.

(iii). Dangerous Probability of Success

Plaintiff's claim that United has a dangerous probability of success depends upon an inference based upon United's market power. If there is a factual dispute as to whether United has monopoly power in the national CRS market, then there is a material issue of fact as to whether it has a dangerous probability of success. Therefore, summary judgment must be denied.

2. Local CRS Markets
Defendant moves for summary judgment on Continental's claim that United attempted to monopolize certain local CRS markets. Plaintiff argues that summary judgment can not be granted because (1) plaintiff has presented evidence of anticompetitive conduct tending to exclude competitors from the market (predatory pricing in conjunction with contractual provisions), and (2) dangerous probability of success (defendant's market share in each allegedly relevant market). Finally, specific intent is inferable from either market power or exclusionary conduct.
However, plaintiff has the burden of establishing that local CRS markets are "relevant markets" if the conduct of the attempted monopolizer is ambiguous or not clearly predatory. In this case, United's conduct is ambiguous or not clearly predatory. Long term contracts serve the legitimate business purpose of enabling United to make the sizeable investment to automate travel agencies with Apollo equipment with confidence that the equipment would be in place long enough for United's costs to be recovered and earn a profit; liquidated damage provisions serve the purpose of providing certainty as to the amount of United's damages in case of an agent's breach of an Apollo contract; and the 95% rule assured that if United installed Apollo equipment in an agency location, it would be used to generate booking fee revenues for United.
Therefore, plaintiff must show that local CRS markets are relevant markets for antitrust purposes. The only evidence offered in support of local CRS markets is the testimony of a Continental officer (Lenza) who states that Apollo accounts for over 60% of all air travel "processed" in nine states and three metropolitan regions. Market share data, standing alone and unsupported by evidence of significant entry barriers, does not support a finding that local markets constitute relevant submarkets. Thus, plaintiff has failed to show that the local markets constitute relevant submarkets and summary judgment should be granted.[22]

3. Local Air Transportation Markets
Plaintiff claims that its damage study provides evidence that Continental was "excluded" from various local air transportation markets as a result of United's exercise of monopoly power in the overlying CRS market (or Apollo market). Thus, the damages claims are alleged to be cognizable under the theory of monopoly leveraging. (See, below). However, as a fallback position, Continental also claims that these market exclusion claims are also valid claims of attempted monopolization. United seeks summary judgment as to the attempted monopolization claims.
Plaintiff must show that local air transportation markets are "relevant" markets because the conduct of the alleged monopolizer is either ambiguous or not clearly predatory. Blanton v. Mobil Oil Corp., *1472 721 F.2d at 1214. (See, above section describing United's conduct as ambiguous).
The evidence submitted supports defendant's contention that the only relevant air transportation market is the national market. Continental's own expert (Fischer) supports this conclusion. (See, discussion of relevant air transportation market in section pertaining to American). Plaintiff has failed to provide evidence suggesting entry barriers such as slot limitations which would support the finding of a local market. Thus, summary judgment should be granted for failure to establish that local air transportation markets are relevant markets for antitrust purposes.

VI. Monopoly Leveraging Theory
The court has considered the internal elements under the theory of monopoly leveraging and has determined that plaintiffs have presented evidence sufficient to survive a motion for summary judgment. However, it does not appear that the monopoly leveraging theory is consistent with the requirements of Section 2 of the Sherman Act. On that basis, the court grants defendants' motion for summary judgment.
The monopoly leveraging theory of liability holds that it is an act of monopolization for a firm having monopoly power in one market to exploit that power as a "lever" to secure competitive advantages in a second market, irrespective of the degree of market power actually achieved by the defendant within the second market. "[T]he use of monopoly power in one market to gain a competitive advantage in another is a violation of Section 2, even if there has not been an attempt to monopolize the second market. It is the use of economic power that creates the liability." Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 276 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

A. Monopoly Leveraging in the Ninth Circuit
"The existence and scope of monopoly leveraging as an independent basis for Section 2 liability in this [Circuit] is not clear." Catlin v. Washington Energy Co., 791 F.2d 1343, 1346 (9th Cir.1986). The court in Catlin noted that the Ninth Circuit has yet to rule on the issue of whether monopoly leveraging is a separate Section 2 violation, with elements distinct from monopolization or attempted monopolization. The court stated it would be appropriate to reserve ruling on the issue until it was presented with a case which required a determination of the issue.
In M.A.P. Oil Co. v. Texaco Inc., 691 F.2d 1303, 1305-06 (9th Cir.1982) the court stated[23] that Section 2 prohibits the use of monopoly power in one market "to gain an unwarranted competitive advantage" in the leveraged market. In Catlin, the court emphasized the adjective "unwarranted" as limiting the rule. The court also cited Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534 (9th Cir.1983), cert. denied, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984), where the court held that "to constitute a valid claim under Section 2, the introduction of the product in a second market must involve `some associated conduct which constitutes an anticompetitive abuse or leverage of monopoly power ... rather than aggressive competition on the merits.'" Catlin, 791 F.2d at 1346 (emphasis added in Catlin). This much is certain, the Ninth Circuit has rejected a "monopoly leveraging theory flatly prohibiting the use of lawfully acquired monopoly power in one market to gain any competitive advantage in another market, especially where there has been no attempt to monopolize in the second market and no abuse of monopoly power in the first." Catlin, 791 F.2d at 1346.[24]

*1473 B. Elements of Monopoly Leveraging
Monopoly leveraging in this Circuit is only cognizable (if ever) when defendant uses its monopoly power in one market to gain an "unwarranted" competitive advantage in the leveraged (second) market. M.A.P., 691 F.2d at 1306. Thus, an impermissible "use" of monopoly power does not encompass benefits reaped in a second market through the efficient size, integration, and competitive advantages of a monopoly's broad based activity. Catlin, 791 F.2d at 1346 (citing Berkey Photo, 603 F.2d at 276).
The following elements must be established: (1) the activity complained of must "entail an abuse of monopoly power itself, as opposed to the mere use of competitive advantages which the defendant enjoys for some reasons distinct from its power to set prices or exclude competition from the first market", Grason Elec. Co. v. Sacramento Mun. Util. Dist., 571 F.Supp. 1504, 1517 (E.D.Cal.1983); Catlin, 791 F.2d at 1346; (2) the advantage sought in the second market must be "unwarranted", Grason, 571 F.Supp. at 1517-18; Catlin, 791 F.2d at 1346; and (3) plaintiff must define "both the market in which monopoly power is allegedly held, and the separate markets in which the leveraging of that power has allegedly taken place." Grason, 571 F.Supp. at 1518 (citing M.A.P., 691 F.2d at 1305-08).

1. Use of "Monopoly" Power
The activity complained of must entail an abuse of monopoly power itself, as opposed to the mere use of competitive advantages which the defendant enjoys for some reasons distinct from its power to set prices or exclude competition. Catlin, 791 F.2d at 1346.
Display biasing can be accomplished by any firm which is vertically integrated in both the CRS and the air transportation markets. Biasing has been used since the inception of the CRS. Thus, display biasing does not appear to be an abuse of "monopoly power" since the activity does not depend upon defendant's power to set prices or exclude competition.
However, the economic feasibility of biasing, and the degree of bias in the system are functions of defendant's power in the overlying market. For example, if the CRS market is highly competitive then a substantial degree of bias would not be possible due to competitive conditions in the market. Biasing can be thought of as part of the "cost" of the system, and travel agents would be unwilling to tolerate substantial display bias in a competitive CRS market. If defendant has monopoly power in the CRS market then it will have the power to engage in substantial display bias. Therefore significant display bias is dependent upon the exercise of monopoly power. There is evidence that defendant engaged in a significant degree of biasing, and that the degree of bias increased over time until the 1984 CAB rules were enacted.

2. Unwarranted Advantage in the Second Market
The Ninth Circuit has held that the competitive advantage sought in the second market must be "unwarranted," not merely the seeking of competitive advantage in another market. M.A.P., 691 F.2d at 1305-06; Catlin, 791 F.2d at 1346.
In Grason, Judge Karlton reasoned that "unwarranted" should be interpreted in light of existing antitrust learning pertaining to "willful acquisition or maintenance" of monopoly power under Section 2. Grason, 571 F.Supp. at 1518.
The Ninth Circuit has repeatedly held that
"in determining whether a defendant's conduct constitutes the willful acquisition or maintenance of monopoly power required for the offense of monopolization, `the test is whether the defendant's acts, otherwise lawful, were unreasonably restrictive of competition.'"
Id. at 1518 (quoting, Transamerican Computer Co. v. IBM Corp., 698 F.2d 1377, 1382 n. 2 (9th Cir.1983), quoting California *1474 Computer Prod., 613 F.2d at 735-36).[25]
Display biasing is unreasonably restrictive of competition in that it restricts competition on the merits in the air transportation business. When consumers attempt to purchase a ticket on the best available flight their final decision is not solely based upon the merits of the particular flight (flight time, price, service, etc.). Rather, biasing artificially inflates the value of the host airline's flights by listing their flights above better flights. The consumer bears the brunt of this practice by getting a less than optimal flight, and the airline with the better flight has lost a sale it should have otherwise made. This type of competitive advantage depends upon the perpetration of a fraud upon the consumer. It is unreasonable and therefore an unwarranted competitive advantage because it inhibits competition on the merits.

3. Defining the Relevant Markets
In this case there is no dispute that the national CRS market and the national air transportation market are distinct markets for antitrust purposes.

C. Danger of Monopolization as Limitation on Section 2 Claims
In Copperweld, the Court said that "[t]he conduct of a single firm is governed by section 2 alone and is unlawful only when it threatens actual monopolization. It is not enough that a single firm appears to `restrain trade' unreasonably, for even a vigorous competitor may leave that impression." Copperweld, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); Drinkwine v. Federated Publications, Inc., 780 F.2d 735, 740 (9th Cir.1985), cert. denied, 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986).
Under the above stated elements for monopoly leveraging a single firm may be deemed to have violated the antitrust laws for seeking an "unwarranted" competitive advantage in the second market. This permits a court to impose liability on a single firm where that firm's conduct does not threaten actual monopolization. If "unwarranted" is interpreted to require danger of monopolizing the second market, then the concept of monopoly leveraging merges into attempted monopolization.[26] Thus, the unilateral conduct of a firm is deemed to violate section 2, pursuant to the theory of monopoly leveraging, despite the fact that its conduct may pose no threat of monopolization in the second market, and its possession and maintenance of monopoly power in the primary market is lawful.
The Supreme Court has stated:
In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.

Copperweld, 104 S.Ct. at 2740; Drinkwine, 780 F.2d at 740. Yet, under the monopoly leveraging theory a firm may be deemed liable merely upon a showing that its conduct was unreasonably restrictive of competition.
*1475 First of all, the theory is inconsistent with Copperweld's reading of the section 2 requirement that a monopolist's action must threaten monopolization. Second, the monopoly leveraging theory appears to be unnecessarily restrictive. Monopoly leveraging is prohibited because "a firm may not use its market position as a lever to create a monopoly in another market." Betaseed, Inc. v. U and I Inc., 681 F.2d 1203, 1231 n. 42 (9th Cir.1982). The social evil at issue, creation of a monopoly in another market, is controlled adequately under the theory of attempted monopolization. Pursuant to that theory, a firm may be deemed liable when it engages in predatory or anticompetitive conduct[27]and when there is a dangerous probability of successful monopolization.[28] Monopoly leveraging is overly restrictive because it attacks unilateral conduct which does not threaten monopolization. The danger is that such scrutiny will inhibit vertically integrated firms from vigorously competing in complementary markets.[29] While halting a monopolists advances in their incipiency may represent a rational policy decision, it appears to be the a policy precluded by the language of section 2, as well as the purpose of the statute as interpreted in Copperweld.
Therefore, summary judgment on the monopoly leveraging claim would be appropriate because the theory is inconsistent with the requirements of section 2, and there is no good reason to expand liability under section 2 when the primary social evil attacked by the doctrine can be controlled through the traditional offense of attempted monopolization.

VII. Travel Agent Conspiracy
Defendant United has moved for summary judgment on Continental's claim that the same conduct which they alleged to have constituted monopolization and attempted monopolization also amounts to violations of the anti-conspiracy provisions of section 1 of the Sherman Act. The basis of this claim is that United's actions were taken pursuant to contracts between United and the Apollo travel agents.
Defendant has failed to present any evidence indicating that United's actions were anything but unilateral. A contract between United and its Apollo subscribers does not constitute a violation of section 1 where the contract merely provides the terms upon which the parties will deal with one another during the course of the relationship. 49er Chevrolet, Inc. v. General Motors Corp., 803 F.2d 1463, 1467 (9th Cir.1986).
Continental has not opposed this motion, and the motion was explicitly indicated in United's Notice of Motion. Summary judgment is appropriate.
IT IS THEREFORE ORDERED that:
(1) Defendants' Motion for Summary Judgment on plaintiffs' Section 2 claim based upon Essential Facilities Doctrine is GRANTED;
(2) Defendants' Motion for Summary Judgment re: monopolization and attempted monopolization of CRS market and SABRE/Apollo market is DENIED;
(3) Continental's Motion for Summary Adjudication re: Market Power is DENIED;
(4) United's Motion for Summary Judgment re: monopolization of national air transportation market, various local air transportation markets and certain local CRS markets, and American's motion re: certain local CRS markets, are GRANTED;
(5) American's Motion for Summary Judgment re: attempted monopolization of the *1476 following markets; national air transportation market, LaGuardia-Detroit, LaGuardia-Chicago, and Chicago-Los Angeles is GRANTED;
(6) American's Motion for Summary Judgment re: attempted monopolization of Dallas/Ft. Worth market is DENIED;
(7) United's Motion for Summary Judgment re: attempted monopolization of the national CRS market is DENIED;
(8) United's Motion for Summary Judgment re: attempted monopolization of Local CRS markets and Local Air Transportation markets, and American's motion re: local CRS markets, are GRANTED;
(9) Defendants' Motion for Summary Judgment on plaintiffs' Monopoly Leveraging Theory is GRANTED;
(10) United's Motion for Summary Judgment on Continental's claim for travel agent conspiracy is GRANTED.
NOTES
[1] For the sake of simplicity this section will refer only to American and SABRE. There are no relevant factual distinctions between the claims against United and American for purposes of the essential facilities doctrine.
[2] The minimum of parity ruled was outlawed by the CAB in 1984.
[3] United had a 95% rule, which required 95% of United's bookings through an Apollo agent to be made through Apollo.
[4] That is, American may be able to raise its rival's costs through imposing monopoly prices in a related market. While the effect in the air transportation market may be enough to "restrain trade", it is not enough to create a danger of monopolization.
[5] The parties have noted that under this court's essential facilities analysis, American's power was deemed to be dissipated by the existence of competing CRSs, while under the monopoly power and relevant market analysis, the court has found a factual issue as to whether American's market power is limited by the existence of competing CRSs. This distinction is based upon the different markets at issue: The air transportation market and the CRS or SABRE market.
[6] The following elements have been deemed necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability to practically or reasonably duplicate the essential facility; (3) the denial of the use of a facility to a competitor; and (4) the feasibility of providing the facility. Ferguson v. Greater Pocatello Chamber of Commerce, 848 F.2d 976, 983 (9th Cir.1988).
[7] This section will refer only to defendant American Airlines for the sake of simplicity. The analysis is equally applicable to defendant United Airlines.
[8] This "market" would be the market for access to CRS-automated travel agents.
[9] The term "submarket" is used to refer to a distinct and economically relevant "market" which is drawn from a broader market. The term submarket will not be used in this memorandum because the prefix "sub" merely creates confusion and is superfluous. P. Areeda & H. Hovenkamp, at 312.
[10] Since competing CRS vendors already exist, there is no need for firms to start from the ground up.
[11] CRS Vendors' Shares of CRTs

Year SABRE Apollo SystemOne Pars DATAS II Total
1980 42.0% 40.6% 0% 17.4% 0% 100%
1981 44.1 39.8 .4 15.6 0 100
1982 44.2 36.5 3.9 14.4 .9 100
1983 40.9 32.6 7.3 14.8 4.4 100
1984 40.3 30.3 9.0 13.7 6.6 100

[12] The CAB rules require uniform booking rates.
[13] SystemOne was just beginning in 1981, and DATAS II began in 1982.
[14] Apollo's market share has dropped approximately 10% since SystemOne and DATAS II entered the market. SABRE has fallen from a high water mark of 44.2% in 1982 to 39.7 in 1985.
[15] The court noted that pricing that was not profit-maximizing in the short run may be legitimate, competitive behavior under this test if based upon long term considerations "as long as those do not include the anticipation of enhanced market power as a result of predation." Inglis, 668 F.2d at 1034 n. 29.
[16] The only mechanism for making the travel agents internalize the costs placed on participating airlines through booking fees is the extreme option which no airlines can afford under current market conditions: refusal to participate in the CRS.
[17] American has also made a request for summary judgment on this claim.
[18] American's motion for summary judgment is granted for the same reasons.
[19] Price fixing is a per se violation of section 1 of the Sherman Act.
[20] Predatory pricing can only be effective when there are significant barriers to entry which enable a monopolist to recoup short term losses through monopoly profits reaped after exclusion of a competitor from the market.
[21] American has made the same motion.
[22] American's motion for summary judgment should be granted for the same reasons.
[23] This statement was dictum because the court did not base its decision upon a theory of monopoly leveraging. As stated by the court in Catlin, the Ninth Circuit has "not held that monopoly leveraging is a separate Section 2 violation with elements of proof distinct from monopolization or attempted monopolization." Id. at 1346.
[24] The court noted that it questioned whether Berkey Photo prohibits such leveraging.
[25] The "reasonableness standard under section 2 is the same as that traditionally applied in section 1 litigation." Transamerican, 698 F.2d at 1382-83 n. 2.
[26] If "threat of monopolization" is an element to monopoly leveraging then the offense merges with attempted monopolization. In order to show attempted monopolization, plaintiff must prove specific intent to monopolize, predatory or anticompetitive conduct, and dangerous probability of success. Specific intent can be inferred from either the second or third element. Therefore, plaintiff need show only anticompetitive or predatory conduct and dangerous probability of successful monopolization. Under monopoly leveraging, if "unwarranted" is deemed to include the "threat of monopolization" as part of the term then all cases of monopoly leveraging would be cognizable under the doctrine of attempted monopolization. The "anticompetitive or predatory conduct" element is analogous to the "abuse of monopoly power" element, and the dangerous probability of success element would be substantially similar to the "unwarranted competitive advantage" element.
[27] This element is analogous to the "abuse of monopoly power" element under the monopoly leveraging theory.
[28] The specific intent element is inferred from predatory or anticompetitive conduct or market power.
[29] Plaintiffs claim that United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), and Otter Tail Power Company v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), support the monopoly leveraging theory. However, in both Griffith and Otter Tail, the defendant's conduct violated the "attempt to monopolize" clause of section 2. While there is language in Griffith which suggests that leveraging without a dangerous probability of monopolization may support a claim for section 2 liability, the court was not called upon to make such a determination.